07 C 2925

**CERTIFIED COPY**

In the

# United States Court of Appeals

### For the Seventh Circuit

FILED
Oct 06 2008

No. 07-3913

MARSHA BARTEL,

*Plaintiff-Appellant,*

v.

NBC UNIVERSAL, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 2925—**John W. Darrah,** *Judge.*

---

ARGUED MAY 28, 2008—DECIDED SEPTEMBER 11, 2008

---

Before EASTERBROOK, *Chief Judge,* and RIPPLE and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Marsha Bartel lost her job at NBC Universal, Inc., after she complained that the television show for which she was responsible was not adhering to NBC's internal ethical standards. NBC first turned a deaf ear to her complaints; Bartel then refused to continue acting as producer for the show; and finally Bartel found herself out the door. She sued NBC in federal court,

relying on diversity jurisdiction, for breach of contract. The district court dismissed the complaint for failure to state a claim, and we affirm.

I

The account of the facts that follows accepts Bartel's account as true, since this is an appeal from a dismissal under FED. R. CIV. P. 12(b)(6). *Moranski v. GMC*, 433 F.3d 537, 539 (7th Cir. 2005). If she has not stated a claim even under this favorable approach, then it was correct to terminate the litigation at its outset.

Bartel worked as a journalist for NBC Universal, Inc., for 21 years. She won awards for her work and was regarded as one of the best investigative journalists on the NBC news team. In August 2006, NBC assigned Bartel to be the sole producer of a segment entitled "To Catch a Predator," which was part of NBC's Dateline television program. NBC worked with an organization called "Perverted Justice," which uses agents pretending to be minors to lure adult men into chat rooms. The parties make a date to meet, and the men are led to believe they are arranging a sexual assignation with a minor. When the man arrives at the meeting place, he is arrested, while the confrontation scene is filmed. The sequence is later televised on the Predator segment of Dateline.

As a journalist and producer for NBC, one of Bartel's main responsibilities was to ensure compliance with the ethical standards of journalism and NBC's internal guidelines. Bartel found numerous aspects of the Predator

No. 07-3913 3

segment production to be in violation of these standards and guidelines. She believed, for example, that NBC was providing compensation directly or indirectly to the law enforcement officers participating in the stings. She thought it wrong that "Perverted Justice" representatives did not provide NBC with compete transcripts of their conversations with the targets, and that they did not identify all of their volunteers to NBC. She also objected that Dateline and Perverted Justice were staging the arrests in a way that maximized the humiliation of the target. Bartel informed her superiors at NBC of these problems, but they took no steps to cure them. Bartel then told her supervisors that she could not produce the segment. On November 17, 2006, NBC informed Bartel that her contract would be terminated effective December 25, 2006. NBC asserted that this action was part of a program of lay-offs that it was making because of general economic conditions.

Bartel did not believe this explanation, and so she sued NBC for breach of contract. She asserted that the termination was premature in light of the protection her contract afforded her. In addition, she charged that the reason given for her termination was pretextual; that the real reason was her refusal to produce a segment that violated ethical and company standards; and that her contract included an implicit restriction against firing her for this kind of reason, thus rendering NBC's action a breach of contract.

NBC moved to dismiss the complaint for failure to state a claim. It argued that the contract Bartel attached to the

4                                                                              No. 07-3913

complaint was unambiguous and allowed it to end Bartel's employment when and why it did. The contract, NBC went on, contained no restrictions on allowable reasons for dismissal. NBC also argued that New York law, which both parties agree governs this case, does not allow courts to recognize the implicit restriction for which Bartel was arguing. The district court granted NBC's motion to dismiss, and Bartel appeals.

## II

We give *de novo* review to a district court's dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Moranski*, 433 F.3d at 539. The question whether the language of a contract is ambiguous is one of law, and so we also review that *de novo*. *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006).

Bartel first argues that NBC was not permitted under the contract to end her employment when it did. In support of this position, she sought to introduce extrinsic evidence about the parties' understanding of the contractual arrangements, but the district court held that the language of the contract was unambiguous and therefore denied her request.

The provision that directly addresses the time at which NBC was entitled to terminate Bartel's employment is Paragraph 4(a) of the Letter Agreement between NBC and Bartel:

> The term of this Agreement shall commence on December 26, 2005 and shall continue, subject to suspension, extension or termination as hereinafter provided, for a period of two hundred and eight (208) consecutive weeks thereafter. The term hereof shall be divided into four (4) consecutive cycles of fifty-two (52) weeks each. NBC shall have the right to terminate this Agreement effective at the end of any cycle prior to the last by giving Artist written notice not less than twenty-eight (28) days prior to the end of any such cycle. This Agreement shall automatically terminate at the end of the last cycle without notice, unless the parties agree otherwise.

The Letter Agreement was executed on March 31, 2006, but was retroactively effective as of December 26, 2005.

Bartel argues that "term" and "cycle" are terms of art that are not defined in the contract. But this is plainly not so: the two words are defined right in the paragraph we have just quoted. The "term of this Agreement" is 208 consecutive weeks, with a specified start-point and end-point. That period is divided into four consecutive, equal 52-week sub-intervals, each of which is referred to as a cycle. A reasonable person reading this paragraph would not be confused about the meaning of the words "term" or "cycle" as they are used in the agreement. A definition does not have to read "noun X is defined as . . . ."

Bartel buttresses her ambiguity argument by pointing to Paragraph 5(a) of the Letter Agreement. This, she asserts, demonstrates that Paragraph 4(a) is ambiguous because 5(a) also uses the word "term," but in a different way:

In full payment for the services and/or materials furnished by Artist and in consideration of the rights granted by Artist to NBC and the faithful performance of Artist's obligations hereunder, NBC agrees to pay Artist and Artist agrees to accept the guaranteed annual rate of compensation below, payable bi-weekly. The annual rate(s) of pay reflected herein may not correspond exactly to the amount received in a calendar year. Bi-weekly compensation is calculated by dividing annual compensation by 26.08335.

| Period of *Term* | Annual Rate of Compensation |
| --- | --- |
| 12/26/05-06/24/07 | $175,000.00 |
| 06/25/07-12/21/08 | $180,000.00 |
| 12/22/08-12/20/09 | $185,000.00 |

(Emphasis added).

This paragraph also creates no ambiguity. The word "term" is used consistently in Paragraphs 4(a) and 5(a); it means the 208 weeks beginning on December 26, 2005, and ending on December 20, 2009. Paragraph 5(a) introduces the new word "Period," which is a subdivision of "Term" distinct and independent from the "cycle" subdivision defined in Paragraph 4(a). "Periods" refer to sub-intervals of the Term in which Bartel is entitled to be paid a particular and fixed salary (provided she is still employed). "Cycles" refer to sub-intervals of the Term that define three discrete opportunities at which NBC can elect to terminate Bartel's employment before the end of the Term. Even if Bartel may be correct that the word "Period" in Paragraph 5(a) could have been defined more

No. 07-3913        7

precisely, that does not help her case because Paragraph 5(a) does not discuss times for termination; Paragraph 4(a) does that, and "Period" is not used in Paragraph 4(a).

We hold that the contract is unambiguous. Because NBC gave Bartel written notice on November 17, 2006, that it was terminating her contract effective December 25, 2006 (the end of the first cycle), NBC gave more than the required amount of notice. Thus, it did not breach the contract, assuming its action did not violate any implied-in-law restrictions on reason for dismissal, the point to which we next turn.

III

Even if NBC's termination of Bartel's contract was permissible as a matter of timing, Bartel argues that NBC nevertheless breached the agreement because of an implicit restriction in it. Specifically, Bartel alleges that NBC's stated reason for firing her—lay-offs as a general cost-saving measure—is a pretext; the real reason was Bartel's insistence that NBC live up to the ethical standards recognized by the profession of journalism and imposed by NBC's internal guidelines. The latter reason, she continues, is just as impermissible as something like a racially discriminatory motive.

Until *Wieder v. Skala*, 80 N.Y.2d 628 (1992), the sole case on which Bartel relies, was decided, New York declined to recognize any judicially created exceptions to the common-law understanding of at-will employment. *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 305 (1983), was a typical

case. There, the court rejected the plaintiff's invitation to read an implied requirement of good faith into his employment contract, even though the plaintiff's job required him to disclose accounting improprieties and he was discharged for doing so. It held that "under New York law as it now stands, absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired."

Bartel does not contend that the termination of her employment contract violated the Constitution, a statutory proscription, or an express limitation in the contract (putting aside the timing argument that we have rejected). Instead, she argues that *Wieder* recognizes an exception not only to the rules for employment-at-will, but also inserts an implied term into all employment contracts. In *Wieder*, an attorney working as an associate at a law firm was fired after demanding that the firm report another associate's misconduct to the state disciplinary committee. The Court of Appeals of New York found that "in any hiring of an attorney as an associate to practice law with a firm there is implied an understanding so fundamental to the relationship and essential to its purpose as to require no expression: that both the associate and the firm in conducting the practice will do so in accordance with the ethical standards of the profession." 80 N.Y.2d at 635-36. Bartel argues that the same rule should apply to a journalist working for a news organization such as NBC. But in *Wieder* itself the Court of Appeals was careful to distinguish the situation of a lawyer from

No. 07-3913 9

that of others who might also have ethical duties, but for whom it refused to recognize an implicit restriction on termination. See *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329 (1987) (director of financial projects); *Murphy*, 58 N.Y.2d at 305 (accountant and assistant treasurer). See *Wieder*, 80 N.Y.2d at 635. The Court has continued to draw that line since *Wieder*: see *Horn v. New York Times*, 100 N.Y.2d 85 (2003) (physician employed by nonmedical organization, where physician was seeking to enforce patient confidentiality).

As we read *Wieder*, the court went to great lengths to highlight the uniqueness of the legal profession and to narrow its holding to that particular profession—perhaps even to the particular disciplinary rule at issue in that case. The opinion is riddled with limiting language, some of which we highlight here:

> [1] [Plaintiff's] employment as a lawyer to render professional services as an associate with a law firm differs in several respects from the employments in *Murphy* and *Sabetay*. . . . plaintiff's performance of professional services for the firm's clients *as a duly admitted member of the Bar* was at the very core and, indeed, the only purpose of his association with defendants. Associates are, to be sure, employees of the firm but they remain *independent officers of the court* responsible in a broader public sense for their professional obligations.

*Wieder*, 80 N.Y.2d at 635 (emphasis added).

> [2] It is in this *distinctive* relationship between a law firm and a lawyer hired as an associate that plaintiff

> finds the implied-in-law obligation on which he founds his claim.

*Id.* at 635-36 (agreeing with plaintiff) (emphasis added).

> [3] The particular rule of professional conduct implicated here (DR 1-103[A]), it must be noted, is critical to the *unique* function of self-regulation *belonging to the legal profession*. . . . Moreover, as plaintiff points out, *failure to comply with the reporting requirement may result in suspension or disbarment.*

*Id.* at 636 (citation omitted) (emphasis added).

> [4] We agree with plaintiff that these *unique characteristics of the legal profession* in respect to this core Disciplinary Rule make the *relationship of an associate to a law firm* intrinsically different from that of the financial managers to the corporate employers in *Murphy* and *Sabetay*.

*Id.* at 637 (clarifying the narrowness of the *Wieder* holding by noting that not every rule of professional responsibility for lawyers is "deemed incorporated as an implied-in-law term in every contractual relationship between or among lawyers") (emphasis added).

More telling even than the language in *Wieder* is the language in *Horn v. New York Times, supra.* Postdating *Wieder* by eleven years, *Horn* discusses that case and the other relevant cases at length. It is the most recent pronouncement by the Court of Appeals of New York on its view of the law. Because we are sitting in diversity, we must rule as we think the highest court of the state

would rule if it were deciding the case, even if we think that another approach would be preferable.

In declining to expand the "narrow exception to the at-will employment doctrine adopted in *Wieder*," *Horn* reaffirmed New York's position that "such a significant change in our law is best left to the Legislature." 100 N.Y.2d at 92, 96-97 & n.4 (noting that "the Legislature remains active in this area, just last year having enacted a new Whistleblower Law to protect certain health care workers"). *Horn* noted New York's "strong disinclination to alter the traditional rule of at-will employment." *Id.* at 93. It then catalogued the "unique" aspects of the legal profession that were critical to the recognition of an exception in *Wieder*. *Id.* at 94-96. It pointed out that the New York Legislature has delegated to the state judiciary the task of overseeing attorney self-regulation, and so the leave-it-to-the-Legislature argument had less force for the situation in *Wieder*. *Id.* at 94. Recognizing the importance of physician-patient confidentiality, the court acknowledged that Plaintiff Horn "strikes a sympathetic, and even a seductive, chord," but she had nonetheless "failed to plead facts that place her claim for breach of contract within the *Wieder* exception to the at-will employment rule." *Id.* at 95, 96.

*Horn* leaves us convinced that the Court of Appeals of New York would decline to expand *Wieder* to include journalists. We therefore find no breach of contract on NBC's part, even assuming that Bartel can prove that the reason NBC offered for the lay-off was pretextual.

\* \* \*

We AFFIRM the judgment of the district court.

9-11-08